NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ROBERT A. MIELIWOCKI, | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 03-780 (WHW) |
| | : | |
| UNIVERSITY OF MEDICINE AND | : | |
| DENTISTRY OF NEW JERSEY, DIANE | : | |
| DEMARTINO and LINDA SHAW, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**Walls, Senior District Judge**

Defendants University of Medicine and Dentistry of New Jersey ("UMDNJ"), Diane DeMartino ("DeMartino"), and Linda Shaw ("Shaw") (collectively, the "defendants"), move for summary judgment against the plaintiff, Robert A. Mieliwocki ("plaintiff"), pursuant to Fed. R. Civ. P. 56. Their motion, decided without oral argument pursuant to Fed. R. Civ. P. 78, is granted.

### FACTS AND PROCEDURAL BACKGROUND

Plaintiff filed a complaint against the defendants, alleging claims under the Americans with Disabilities Act of 1990, 42 U.S.C. §12112 and 42 U.S.C. §12203 (the "ADA"), and the Family and Medical Leave Act, 29 U.S.C. §2615 (the "FMLA"). Plaintiff claims that defendants unlawfully discriminated against him under the ADA by denying his request for reasonable accommodation and terminating his employment. (Count one). He also alleges that defendants interfered with his right to medical leave under the FMLA. (Count three). Last, plaintiff claims

**NOT FOR PUBLICATION**

that defendants retaliated against him for making complaints under the ADA and asking for intermittent leave under the FMLA.  (Counts two, four and five).  Defendants move for summary judgment on plaintiff's claims.

The following facts are undisputed, unless noted:

Plaintiff is a resident of Denville, New Jersey.  Defendant UMDNJ, an educational institution organized under the laws of the State of New Jersey, owns and operates a division known as University Behavioral Healthcare ("UBHC").  The UMDNJ currently maintains offices in Edison, New Jersey.  Plaintiff was employed by the UMDNJ from 1991 until his termination on November 5, 2001.

From June of 2000 until plaintiff's termination, Defendant Shaw was the manager of plaintiff at UMDNJ.  Defendant DeMartino was plaintiff's immediate supervisor for at least part of the time of plaintiff's employment.  Both defendants Shaw and DeMartino were employed by the UMDNJ.

Plaintiff began his employment with defendant UMDNJ in 1991 in the position of Mental Health Clinician II, assigned to the UBHC division.  As Mental Health Clinician II, defendant asserts that plaintiff's primary duties involved treating patients.  Plaintiff adds, however, that while serving in this role, he provided individual, group and family psychotherapy to assigned clients; participated in the assessment and treatment of the clinical needs of clients; assisted in the development of treatment planning; provided clinical supervision; and served as a liaison to US Healthcare, managing all aspects of the contract including network management.

NOT FOR PUBLICATION

In 1998, UBHC underwent a reorganization that affected virtually all of the persons who worked in that organization, including plaintiff.  The purpose of the reorganization was to make UBHC more efficient so that it could not only serve public sector psychiatry, but could also attract patients with commercial insurance as well.  From 1998 until the fall of 2000, the employees of the reorganized UBHC were stationed at three locations: Newark, Piscataway and Edison.  During this time, plaintiff was in the Newark office.

As part of the reorganization, the Chief Executive Officer of UBHC, Dr. William James Reichman ("Dr. Reichman"), undertook a search for employees who could fit in well with the new goals and orientation of the reorganized UBHC, conducting the search among employees who already worked for UBHC.  Dr. Reichman spoke to Karen Somers, plaintiff's supervisor at the time, about plaintiff's qualifications for a position in the new UBHC.  Somers told Dr. Reichman that plaintiff had experience in the managed care business, but added that plaintiff had some limitations, specifically that she had addressed plaintiff with regard to how he related to her personally and to others, and that he needed help in organizing his work.  Plaintiff denies, however, that Somers had addressed him in this regard.

Dr. Reichman decided to make plaintiff a care manager in the newly reorganized UBHC in 1998.  As a case manager, plaintiff worked on processing health insurance claims for Magellan insurance.  His work also involved authorizing and processing requests by either patients or care providers for a certain number of psychotherapy sessions to be covered by the patients' insurance.  In practice, this involved reviewing treatment summaries, transition of care requests ("toc's"), and what were referred to as non-par's, or requests for coverage of treatment out of the

NOT FOR PUBLICATION

Magellan network.  Plaintiff adds that he had a number of other administrative responsibilities as well.

Defendants claim that while plaintiff was employed at the Newark office of UBHC, from 1998 to the fall of 2000, he received a number of complaints from patients.  (Preuss Cert. at Exh. R).  Plaintiff's supervisor at the time, Marianne Marquis ("Marquis"), became concerned enough about the complaints to inform Dr. Reichman of the problems she was having with plaintiff. Among other problems, Marquis told Dr. Reichman that plaintiff was not attending to his work in a timely manner, his work was piling up, and that they were getting complaints from providers and families.

Dr. Reichman responded to these concerns by having a meeting with plaintiff.  He told plaintiff that a significant portion of his job was customer relations —that it was important to engage clients in a compassionate, sensitive way, and that it was imperative that he not become entangled in their problems.  Plaintiff does not recall this specific meeting.[1]

While Marquis was supervising plaintiff, she held supervisory meetings with Dr. Reichman on a weekly or twice weekly basis; plaintiff's performance problems were a topic at the majority of those supervisory meetings.  Dr. Reichman advised Marquis to be very direct with plaintiff that his performance was hurting the University.  He also advised her to consult with human resources about how to handle the situation.

---

[1]Plaintiff does recall a meeting during which Dr. Reichman explained that he had to respond to the demands of an agitated father.  According to plaintiff, the father complained frequently about *Dr. Reichman* and his inability to address what he perceived to be his son's needs.

NOT FOR PUBLICATION

In an evaluation dated March 21, 2000, which Marquis prepared for plaintiff, Marquis gave plaintiff a 1, the lowest of five possible scores (1 through 5) on the following criteria: 1) meets customer expectations for service; and 2) acts courteously, compassionately and responsively to all customers.[2]  In the section of the evaluation which requested that the evaluator identify developmental needs for the employee, and how UBHC could assist with performance improvement, Marquis wrote that:

> Bob Mieliwocki has attended the UBHC Training and Organizational Course on Interpersonal Relationships Recently.  Bob Mieliwocki's performance with internal and external customers needs to continue to improve as demonstrated by a decrease in complaints from customers, internal and external. Timeliness of decision-making to be addressed by attendance to organization of work and prioritization.  Suggest additional ____/seminar on communication to address difficulties with interactions with customers.

(Preuss Cert. at Exh. C).  Plaintiff's final rating on the Marquis evaluation was a 2, which plaintiff grieved and had re–evaluated.

Defendant Shaw replaced Marquis as the Director of UBHC in June of 2000.  Shaw asked plaintiff to meet her at 9:00am at her office in Piscataway on July 26, 2000.  Plaintiff arrived late to the meeting, and he attributed his tardiness to a "sleep attack."  At the meeting, Shaw discussed her expectations with him, emphasizing the importance of timely responses to patients and providers.

---

[2]Plaintiff believes the evaluation was maliciously forged and altered by someone within the UMDNJ-UBHC administration after it was written, reviewed and signed by both Marquis and plaintiff.  Furthermore, plaintiff recalls specifically laughing with Marquis about portions of the evaluation due to the unrealistic expectations of the clients.  Plaintiff adds that he was later re-evaluated and received a higher rating.

NOT FOR PUBLICATION

Defendants claim that during the meeting, plaintiff told Shaw that he was unhappy with the office he was then occupying in Newark.  Plaintiff disputes this statement, arguing that in response to defendant Shaw's inquiry, he informed Shaw that he previously had a nicer work environment, including his office.  However, he never characterized his feeling as being "unhappy."  Plaintiff did, however, indicate that the chair he was currently using was unsuitable. Defendant Shaw arranged for plaintiff to use one of the chairs from Piscataway.[3]

Defendants claim that from the beginning of Shaw's tenure with UBHC, plaintiff continued to have difficulty getting his work done in a timely manner.  Plaintiff says that he recalls one specific class of cases which took longer to complete because they were more labor intensive, but adds that the majority of his work was completed on time as reflected in the comments of the March 2000 through June 2000 evaluation prepared by defendant DeMartino. Despite efforts by DeMartino to improve plaintiff's performance, plaintiff continued to fall behind in his production late in 2000.[4]

_____

[3]Plaintiff disputes this point.  He argues that an ergonomically correct chair had previously been ordered for plaintiff by his former supervisor, Marquis.  Dr. Reichman never signed the purchase order, however, and defendant DeMartino found it in a file on Dr. Reichman's secretary's desk where several other purchase orders were also found.  Defendant Shaw did ask plaintiff to try one of the two spare desk chairs which were located in the office, but they were inadequate.

[4]Plaintiff states that in October, his office was relocated by the defendants.  Notice of this change was not sent out to the clients, and a large amount of plaintiff's work from providers was mailed or faxed to the old office and not forwarded to him in a timely manner.  Many of the faxes were forwarded to a non-working phone line.  In December, plaintiff was on vacation and his workload was not covered by either supervisors or co-workers.

NOT FOR PUBLICATION

The UMDNJ contract with Magellan on which plaintiff was working required that requests for coverage have a turnaround time of no more than five days.  Defendants claim that plaintiff routinely took more than five days to complete his Magellan assignments.  Plaintiff states, however, that the time frame in which to complete work varied based on what type of request was made and the contract specifications at issue.  Moreover, plaintiff notes that the March 2000 through June 2000 evaluation states that a large portion of plaintiff's work was completed on time.

In 2000, Dr. Reichman decided that various UBHC units in Newark, Piscataway and Edison should be brought together in one unit to be located at Edison, New Jersey.[5]  Dr. Reichman believed that locating the entire unit in one location would make the unit more efficient and would help with supervision of the staff.

Shaw informed her unit, including plaintiff, of the impending consolidating in August of 2000.  Plaintiff asked for several accommodations in the new space, including a private office where he could close the door when he had a sleep attack, and an office where he could control the airflow, such as an office with a window.  Shaw explained that it was impossible to control the airflow in the offices in Edison because the windows were sealed and there was no mechanism to control the temperature in the individual rooms.  She added that only supervisors could have private offices.  However, Shaw attempted to accommodate plaintiff's need for privacy by putting him in an office with Emma Gries ("Gries") and Sheila Sannes ("Sannes"),

---

[5]Plaintiff states that discovery has revealed that some of the work performed by members of the Utilization Management Department is still being performed at locations other than the centralized Edison, New Jersey location.

NOT FOR PUBLICATION

both of whom spent a substantial amount of their time working in the hospital getting

authorizations for patients, and consequently were absent from the office a substantial part of

each day.[6]  On most days, neither Gries nor Sannes would get to the office until later in the day.

However, Shaw told plaintiff that if either Gries or Sannes was in the office when he had a sleep

attack, he could use the conference room, which was generally empty in the afternoon, in order to

get some privacy.  Plaintiff was also given a fan to help with the air movement.

      On September 7, 2000, Shaw received a note written on a prescription pad from Dr.

Jeffrey Nahmias ("Dr. Nahmias"), plaintiff's doctor:

> Mr. Robert Mieliwocki suffers from Narcolepsy and must avoid long drives which
> causes sleepiness.  Please either allow him to stay in Newark or give him Flex-
> Time to travel & from work "out-of" rush hour.

(Preuss Cert. at Exh. M).  Shaw considered plaintiff handicapped once she received this note.[7]

She responded with a letter to plaintiff on September 22, 2000, rejecting his request to stay in

Newark on the grounds that "the move to Edison [was] required to improve the utilization

process and work more closely with the transfer center and Access Center staff."  (Preuss Cert. at

Exh. N).  However, in order to accommodate Dr. Nahmias's request that he be given work times

that would not involve driving in rush hour, Shaw offered to let him work from 12 to 8 on

---

[6]Plaintiff says that being placed in the office with Gries and Sannes did not afford him
privacy during a sleep attack.

[7]Plaintiff denies that Shaw considered him handicapped, because had this been the case,
defendants would not have needed to request a second opinion regarding his narcolepsy.

NOT FOR PUBLICATION

Monday through Thursday and from 10 to 6 on Friday.[8]  Shaw requested that plaintiff get back to

her by September 29, 2000.  When he failed to respond to the offer, he was instructed to work

from 9 to 5.

Dr. Nahmias rejected the offer of a 12-8 schedule in a letter dated October 12, 2000, and

asked that plaintiff be allowed to stay in Newark and keep his variable schedule.  Alternatively,

Dr. Nahmias stated that the would only okay the longer commute if plaintiff's schedule stayed

the same.  In an October 17, 2000 letter, Shaw stated that the proposed variable work schedule

included in Dr. Nahmias's letter "[did] not meet the needs of the department."  (Shaw Cert. at ¶

112). She also indicated that his hours would be 8:30 to 5 Monday through Friday, and that the

University policy with regard to time and attendance would be enforced.   Plaintiff was

ultimately allowed to come in half an hour later than normal, yet he was still regularly late to

work during the time he worked at Edison.  However, plaintiff was never disciplined for arriving

to work late in Edison.

According to defendants, plaintiff's caseload increased due to his cases becoming more

and more backlogged.  Plaintiff says that a number of factors contributed to his work becoming

backlogged, including the fact that when he was justifiably absent from work, his work was not

distributed or completed by his supervisor.  Moreover, plaintiff says that he was assigned an

_____

[8]Plaintiff denies that this constituted an accommodation under FMLA.  Plaintiff says that
he operated a private practice with the approval of members of management.  When defendant
Shaw became plaintiff's supervisor, she became obsessed with trying to interfere with his private
practice, and proposed this work schedule as a retaliation that would require plaintiff to work
every evening.

**NOT FOR PUBLICATION**

excessive number of cases in comparison to his co-workers.  Defendants note that plaintiff's

cases had to be reassigned to others for completion, although plaintiff disputes this contention.

Defendants state that Shaw responded to plaintiff's difficulties by discussing his

problems with Dr. Reichman and Howard Pripas, the Labor Relations representative in Newark.

On September 27, 2000, Shaw issued a Staff Counseling Notice to plaintiff concerning his

performance, which reads:

> Bob continues to have difficulty performing his duties in a timely manner.
> Treatment summaries are not processed in a timely manner, resulting in
> distribution of Bob's work on at least 3 separate occasions.  Most recently 23
> treatment plans were distributed to the transfer center staff.  In August and early
> Sept., 20 and 30 treatment plans were distributed to other staff members to
> complete.
>
> Transition of Care cases and non-par requests are not processed according to
> Magellan time frames.  In several cases there was no clear documentation as to
> what the outcome was of the clinical discussions that took place.  In one case a
> provider complained it has taken over ? months to resolve a transition issue.

(Preuss Cert. at Exh. B).  Plaintiff argues, however, that between July 26, 2000 and September

27, 2000, his work was not redistributed while he was on vacation for three weeks.  Moreover,

frequent database crashes caused data to be lost that hampered his efforts to complete the

assignments.

Defendants claim that Shaw and DeMartino discussed their expectations of the plaintiff at

the time the counseling notice was given to him and attempted to formulate a plan with him to

improve his production.  They agreed on a plan whereby he was required to complete ten case

summaries a day, in addition to answering his phone calls, and was supposed to meet with his

supervisor on a regular basis for help in better prioritizing his time in order to meet the five day

-10-

NOT FOR PUBLICATION

turnaround requirement.  Plaintiff says that his meetings with defendants Shaw and DeMartino were frequently cancelled, and adds that they never agreed to any such plan.  Rather, he asserts that the plan was imposed on him by defendants.

Shaw set up a system whereby the work would be distributed according to the alphabet. Under that system, plaintiff was to be assigned the cases of all individuals whose names begin with the letters p through z.  Defendants argue that plaintiff did not get more cases on a regular basis than any of his co-workers, as demonstrated the following number of cases from the year 2000: 1) John Markey - 1412; 2) Phyllis Phalana - 1765; 3) Robert Mieliwocki - 1525. Plaintiff, on the other hand, claims that he received a disproportionate number of the cases.  He disputes these numbers, noting that the actual database records for this time frame show that the numbers reflected in this document were not the actual number of cases which were assigned to each employee.  He adds that defendants are in possession of these records which contain confidential information.

Some of plaintiff's cases were redistributed because there were patients that needed immediate action on their cases.  Overall, plaintiff had to redistribute several treatment plans from August through December of 2000, although it is not exactly clear how many were redistributed.[9]  Plaintiff disputes this point, arguing that this is the period during which he made a

_____

[9]Defendants' statement of undisputed material facts states that 23 cases were redistributed from August and September of 2000, 6 in October, 15 in November, and 20 in December. (Defendants' Statement of Undisputed Material Facts ("Def's SUMF") at ¶ 62).  The Shaw Certification, however, states in paragraph 23, that "[m]ost recently 23 treatment plans were distributed to the transfer center staff.  In August and early Sept., 20 and 30 treatment plans were distributed to other staff members to complete." It is unclear to this Court what this statement means.  It seems to suggest that 73 treatment plans were redistributed in the period addressed, not

NOT FOR PUBLICATION

request under the ADA for an accommodation based on his narcolepsy.  He adds that he was on

vacation during a portion of this time, and his work was not addressed by either supervisors or

co-workers.  Finally, plaintiff's office was relocated during this time period, and his clients were

not notified of the move until after it took place.

In addition to the staff counseling notice, plaintiff also received a staff disciplinary notice

on September 27, 2000, regarding the crashing of his computer.  On August 31, 2000, plaintiff

reported that he was having trouble with is computer.  The information services department was

called into fix plaintiff's computer, and discovered that plaintiff, who had a hobby of growing

orchids, had overloaded his computer's memory by downloading 92 internet files that concerned

or contained pictures of orchids.  The internet access section of the UBHC policy manual states

that UBHC staff may not download programs, screen savers, games, or other non-work related

files from the internet.  The internet access section of the UBHC policy also provides that

"violations of this policy may result in disciplinary action, up to and including dismissal, as

applicable under other UBHC policies, guidelines, procedures, or collective bargaining

agreements."  (Preuss Cert. at Exh. D).  As the result of plaintiff's violating the internet access

policy by downloading the orchids, his computer was rendered unusable for a period of almost

two weeks.  Plaintiff says he never intentionally downloaded any files, and offers several reasons

as to why his computer may have crashed.  He adds that the Union filed a formal grievance of

this allegation, but no decision was ever rendered on the grievance.

---

23.  Moreover, it is unclear exactly when the 23 treatment plans were redistributed.

NOT FOR PUBLICATION

Plaintiff was evaluated for the period from November of 1999 to November of 2000, and received a rating of a "2", which is marginal.  Under the UMDNJ system, two evaluations of 2 or less in succession can be reason for termination.[10]  In this review, plaintiff received a 1, or the lowest possible grade, on the following customer service standards and expectations: 1) takes initiative to understand the needs of all customers; 2) meets customer expectations for service; 3) used feedback to improve customer service; 4) holds self responsible for excellence; 5) acts courteously, compassionately and respectively to all customers; 6) positively represents the school/unit to all customers.  The supervisor also made the following comments in the evaluation:

> Bob's interactions with internal customers needs to improve.  It's recommended, Bob attend UBHC courses on "overcoming Roadblocks to Effective communication" and "Time Management".  Bob needs to develop the ability to organize and prioritize his workload.  Bob needs to improve his interpersonal communication style to eliminate his abrasive responses.

(Preuss Cert. at Exh. G).

In November of 2000, plaintiff applied for intermittent family leave because he was concerned about how frequent late arrivals at work would be treated under UMDNJ's lateness policy.  However, he indicated that working a regular work schedule was consistent with his condition.  As part of the processing of plaintiff's request for intermittent leave, UMDNJ requested that he be examined by a sleep disorder expert located in Philadelphia.  Defendants claim that upon being informed that he needed to see an expert in Philadelphia, plaintiff burst

_____

[10]Plaintiff says that this is not true and not in accordance with the union contract.

**NOT FOR PUBLICATION**

into Shaw's office and yelled at her, "Are you crazy, why do I have to go to Philadelphia!"[11]

(Shaw Cert. at ¶ 48). When Shaw suggested that he take the train and that UMDNJ would pay

for the expenses, plaintiff responded, "oh, we're going to discuss that ridiculous train again."

Defendants note that plaintiff spoke in a loud, hostile and threatening voice to Shaw during the

incident, and that while plaintiff was leaving Shaw's office, he called her a "witch." Plaintiff

denies having made any such statements, or otherwise raising his voice to Shaw.

On January 2, 2001, defendants claim that plaintiff screamed at Shaw while they were in

the parking lot, although plaintiff denies having done so. During that same month, Shaw

received a phonecall from a patient who had attempted to call plaintiff, but had not heard back

for at least two weeks. The patient was anxious to return to treatment. On January 29, 2001, the

office secretary, Rose Bosier, received a phone call from the husband of a patient who wanted to

talk to plaintiff about whether his wife's hospitalization — scheduled for the following day —

would be covered by insurance. Bosier transferred the call to plaintiff. A few minutes later,

Bosier received a second call from the same caller who said that he had reached plaintiff's voice

mail, but that he did not want to just leave a message. Bosier went to plaintiff's office to see if

he was in and found him playing solitaire on his computer.[12] When Bosier explained the

situation to plaintiff, she was told by plaintiff that the patient's husband would just have to call

the next day. Bosier then found one of the case managers, Phyllis Phalana, who was at the

---

[11]Plaintiff denies this statement, and explains that he was required to attend the appointment during the late afternoon on the day before Thanksgiving, and was understandably upset over the scheduling error.

[12]Plaintiff denies that he was caught playing solitaire on his computer.

**NOT FOR PUBLICATION**

elevator waiting to leave, and Phalana took the call.  Bosier sent Shaw a written memo memorializing this incident.

On February 13, 2001, DeMartino found 35 incomplete and overdue TX plans from January through February of 2001, 22 of which were sent in January and 13 in February, as well as 10 toc files. Plaintiff disputes this point, noting that he found these treatment summaries buried in his "to file" box.  Upon discovery, he claims to have notified DeMartino, and after reviewing them,  he says he noticed that none of them had been entered into the case assessment database by the support staff. When he notified Shaw that the case summaries had not been entered into the database, plaintiff says that Shaw became furious and instructed plaintiff that he should not supervise the support staff and should not look into the database despite the fact that care managers were instructed to cross check their active cases against the database file.

From February 21, 2001 to February 23, 2001, Shaw sent plaintiff a list of outstanding noc/non-par requests that dated back to the previous July. On February 13, 2001, Shaw sent plaintiff an e-mail about a patient who had mistakenly been led to believe that UMDNJ would not certify him for any more sessions, and as a result, dropped out of therapy.  That e-mail directed plaintiff to contact the clinician to find out whether further sessions were authorized.  As of February 23, 2001, plaintiff had not resolved the problem.

Plaintiff received a number of complaints in February of 2001.  During that month, Linda Lester of Mercer Consultation Group ("Lester"), one of the care providers for Magellan, initiated

NOT FOR PUBLICATION

a call to Magellan to complain about plaintiff's interactions with her staff.[13]  Lester was put

through to Susan Frederick, the UBHC liaison with Magellan, who turned it into a conference

call with Shaw.  During the course of this call, Lester explained that the clinicians working for

Mercer Consultation had ongoing difficulties interacting with plaintiff in a professional manner.

At Shaw's request, Lester sent Shaw a letter, dated February 13, 2000, documenting the problems

which Mercer Consultation had in dealing with plaintiff.   Around the same time, Shaw received

an unsolicited letter from Dr. Lawrence K. Straus, also of Mercer Consultation Association,

which also documented the difficulties his treatment providers had in dealing with plaintiff.[14]

During that month, Shaw also held a conference call with Susan Frederick and Dr. Gilberto

Pagan, another Magellan provider who had complaints about plaintiff.   Shaw asked Dr. Pagan to

document the complaints he had raised in the telephone call, and he sent a letter to that effect on

May 6, 2001.[15]

        In March of 2001, plaintiff received a 1, or unsatisfactory, on the reappraisal of his prior

annual performance evaluation.  The basis for the unsatisfactory performance evaluation was

plaintiff's continued inability to perform his work in a timely manner and his continued inability

---

[13]Plaintiff states that several staff members at this facility did not think highly of him because he frequently would not approve treatment plans that did not meet Magellan's standards, or would otherwise be deemed medically unnecessary.

[14]Plaintiff disputes that this letter was unsolicited.

[15]Plaintiff does not dispute that the letter was written, but argues that there are case notes contained within his file that disprove the allegations contained in the letter.

**NOT FOR PUBLICATION**

to interact with providers and patients in an appropriate manner.[16]  Under the applicable rules

concerning plaintiff's employment, plaintiff's second consecutive evaluation of 2 or below

would have allowed the defendant to terminate him from employment.[17]  Rather than terminating

him, however, Shaw decided to treat plaintiff's March 2001 unsatisfactory job evaluation as a

warning notice in lieu of suspension and decided to continue working with him.

In April of 2001, plaintiff had 8 non-par toc cases and ten treatment plans that were

incomplete.  Also in April, Shaw was notified about non-pars that plaintiff had not completed,

which were generating complaints from the client.  None of the other case managers fell

significantly behind on their work or had to have their work redistributed as plaintiff did during

this period.  As of June 6, 2001, plaintiff had 8 cases that were beyond the 5 day turnaround time,

with the oldest being from May 15, 2001.  As of June 27, 2001, plaintiff had 50 treatment

summaries that were beyond the 5 day turnaround time, some of which were more than a month

old.

On July 17, 2001, Dr. Senese called the office and said she wanted to lodge a complaint

about plaintiff.  The secretary put her through to Shaw, and she told Shaw that she had called

plaintiff on June 19, 2001, to get an authorization for a patient and the procedure for getting a

patient into treatment, but had not received a response.  Under Magellan rules, she should have

received information within 5 days of her initial contact.  She called plaintiff again on July 6,

---

[16]Plaintiff denies this statement.

[17]Plaintiff denies this statement, arguing that under the union contract, defendant Shaw
would be permitted to give plaintiff a written warning in lieu of suspension for a second
consecutive evaluation of 2 or below.

**NOT FOR PUBLICATION**

2001, and again received no response.  It wasn't until July 10, 2001, or some 21 days after her

initial call, that plaintiff finally called her back.[18]  Senese added that her interaction with plaintiff

had been distasteful, that he was not a happy camper, that he was rude and curt with her, and that

he cut her off.

On August 24, 2001, Shaw received a call from one of the patients that was assigned to

plaintiff, who had called on August 16, and still had not received a referral as of August 24.

Another patient who had called on August 7, 2001, still had not been contacted by plaintiff as of

August 23, 2001.  The records for August show that plaintiff had been unable to keep up with the

ten plans per day requirement.

Plaintiff received several complaints from patients and patients' relatives during the

month of September of 2001. In the two weeks prior to September 26, 2001, Shaw received

several complaints about plaintiff, including one patient who told Shaw that plaintiff was rude,

chewed gum in her ear, acted as if she was annoying her, and who felt that he was not

compassionate.  As of September 26, 2001, there were toc/nonpar cases that were still

outstanding from July. Plaintiff was also discovered during this time period playing cards again

on his computer.[19]

As of October 26, 2001, plaintiff had 95 outstanding incomplete treatment summaries,

and provided no explanations as to why he could not keep up.  66 of the treatment summaries

─────────────────

[18]Plaintiff disputes portions of this statement, but does not clarify what portions are
disputed.

[19]This statement is denied by plaintiff.

**NOT FOR PUBLICATION**

were redistributed.  In the beginning of November of 2001, plaintiff received an annual

evaluation of 1, and was terminated on November 2, 2001.  Defendants emphasize that was not

terminated for his persistent inability to arrive at work on time.[20]

On December 6, 2000, plaintiff filed a verified complaint with the State of New Jersey,

Department of Law & Public Safety, Division of Civil Rights ("DCR"), claiming that he was

discriminated against because of his narcolepsy, and that he was denied a reasonable

accommodation.[21]  On November 26, 2001, plaintiff filed an amended verified complaint with

the DCR, claiming that the defendant had retaliated against him for filing his complaint by

terminating him. On June 20, 2002, the DCR issued a finding of no probable cause with regard to

the charges in both the initial complaint and the amended complaint.[22]  On November 26, 2002,

the finding of no probable cause was adopted by the EEOC, plaintiff's charge with the EEOC

was dismissed, and plaintiff was issued a right to sue letter.  On February 21, 2003, plaintiff filed

a complaint in this district court which is the basis for the defendants' motion for summary

judgment.

---

[20]Plaintiff believes he was terminated for frequently arriving to work late, because defendants frequently made an issue and harassed plaintiff regarding his work schedule.

[21]Plaintiff does not dispute this statement, but believes that a conflict of interest exists because a state agency investigated another state agency and failed to provide plaintiff with the response by the UMDNJ.  Plaintiff, as a result, was unable to adequately respond to their allegations or present any evidence.

[22]Plaintiff again asserts that there is a conflict of interest in one state agency investigating a second state agency.

NOT FOR PUBLICATION

Plaintiff grieved his termination to arbitration.  In a March 7, 2005 decision, the arbitrator, Robert E. Light, found that UMDNJ had fired plaintiff because his work performance was "deficient in his old job," and upheld his termination from that job.  Plaintiff notes, however, that in a clarification of award, dated June 9, 2005, "the arbitrator [stated that he did] not find cause for terminating the grievant, Robert A. Mieliwocki from his employment with the [UMDNJ]."  The arbitrator added that plaintiff should be placed in a Mental Health Clinician II position or a comparable position.  Plaintiff claims that in a parallel proceeding, defendants are working to comply with the arbitrator's decision.

Defendants now move for summary judgment on all of plaintiff's claims.

## STANDARD

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit.  See id. at 248. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question."

NOT FOR PUBLICATION

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  To survive a

motion for summary judgment, a non-movant must present more than a mere scintilla of

evidence in his favor.  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  The

opposing party must set forth specific facts showing a genuine issue for trial and may not rest

upon the mere allegations or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d

Cir. 2001).  At the summary judgment stage the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for

trial. See Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and inferences

in the light most favorable to the non-moving party. Curley v. Klem, 298 F.3d 271, 277 (3d Cir.

2002).

## DISCUSSION

### I.      Count One - Claims Predicated Upon Discrimination under the ADA

Plaintiff argues that when defendants terminated him on November 5, 2001, they were

aware that he suffered from narcolepsy that prevented him from driving long distances, working

at night, or working in an office without air conditioning.  Plaintiff adds that defendants failed to

make reasonable accommodations for his physical limitations which would have allowed him to

continue in his position or a similar position at the defendant UMDNJ. Such "reasonable

accommodations," plaintiff argues, could have been enacted without imposing an undue hardship

upon the defendant employer.  Although it is not clearly delineated in the complaint, the Court

interprets plaintiff's claim under count one as alleging that plaintiff suffered two adverse

employment decisions as a result of discrimination: 1) the failure by the defendant to reasonably

NOT FOR PUBLICATION

accommodate his disability; and 2) his termination from UBHC.  Plaintiff brings this claim

pursuant to Section 102 of the ADA, 42 U.S.C. §12112.

"The Americans with Disabilities Act prohibits employers from discriminating based

upon the known physical or mental impairments of 'a qualified individual with a disability.'"

Skerski v. Time Warner Cable Company, 257 F.3d 273, 278 (3d Cir. 2001) (citing 42 U.S.C. §

12112).  Additionally, the "ADA requires that certain employers provide 'reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability who is an applicant or employee, unless such covered entity can demonstrate

that the accommodation would impose an undue hardship.'"  Dicino v. Aetna U.S. Healthcare,

2003 WL 21501818, at *6 (D.N.J. 2003) (citing 42 U.S.C. §12112(b)(5)(A)); Toyota Motor

Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 193 (2002)).

Because plaintiff's claim arises under the ADA, this Court must apply the burden-shifting

framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and clarified in

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-256 (1981).  See Eckhaus v.

Consolidated Rail Corp., 2003 WL 23205042, at *7 (D.N.J. 2003) (applying McDonell

Douglas/Burdine burden shifting to cases of disability discrimination).  "Although McDonnell

Douglas addressed Title VII claims specifically, this burden-shifting scheme has been expanded

to claims brought under the ADA...."  Eckhaus, 2003 WL 23205042, at *7 (citing Walton v.

Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 667-668 (3d Cir. 1999)).  Under the

McDonnell Douglas/Burdine model, a discharged employee must first prove a *prima facie* case

of discrimination. Burdine, 450 U.S. at 252-253. After plaintiff establishes his or her *prima facie*

-22-

NOT FOR PUBLICATION

case, the burden of production shifts to the employer to articulate a legitimate, non-

discriminatory reason for the adverse employment decision. Id. at 253.  Once the employer does

so, plaintiff must then demonstrate that the proffered reason was pretextual.  Id.

        To make out a *prima facie* case of discrimination under the ADA, a plaintiff must

establish that s/he (1) has a "disability," (2) is a "qualified individual," and (3) has suffered an

"adverse employment decision" as a result of discrimination based on that disability.  Turner v.

Hershey Chocolate U.S., 440 F.3d 604, 611 (3d Cir. 2006) (citations omitted).  At the *prima*

*facie* stage of analysis, the Court merely determines whether plaintiff has submitted sufficient

evidence so that the Court should consider the defendants' proffered reasons for its decisions.

See Jones v. School Dist. of Phila., 198 F.3d 403, 412 (3d Cir. 1999) (describing what is needed

to satisfy the *prima facie* standard).

        Defendants in this case do not dispute that plaintiff was disabled.  Rather, they argue that

plaintiff cannot show that he is a "qualified individual," or that he has suffered an "adverse

employment decision" as a result of his disability.

        A.      Plaintiff's *prima facie* case of discrimination under ADA

              *1.*     *Is plaintiff a "qualified individual"?*

        A "qualified individual with a disability" is defined by the ADA as a person "with a

disability who, with or without reasonable accommodation, can perform the essential functions

of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  "To

satisfy this requirement, a plaintiff must first demonstrate that s/he 'satisfies the requisite skill,

experience, education and other job-related requirements of the employment position that such

NOT FOR PUBLICATION

individual holds or desires.'"  Skerski, 257 F.3d at 278 (citation omitted).  "Second, a plaintiff

must establish that s/he, 'with or without reasonable accommodation, can perform the essential

functions of the position held or sought.'"  Id.  Defendants argue that plaintiff cannot show that he

could perform the essential functions of his case manager position.

      The "essential function" inquiry contains two prongs.  The first prong asks whether

plaintiff could perform the essential functions of his job without reasonable accommodation.  If

he can, then he will be considered a qualified individual.  If he cannot perform the essential

functions without reasonable accommodation, the Court must consider whether plaintiff could

perform those essential functions with a reasonable accommodation.  Again, if he can do so, then

he will be considered a qualified individual under the ADA.  Skerski, 257 F.3d at 278.

      The essential function which defendants argue plaintiff was unable perform was the

processing, within five days, of patient's or doctor's requests to have patients' needed psychiatric

courses of treatment covered by insurance.  Plaintiff argues that this was not an essential function

of the job.

      The Court first looks to the relevant agency regulations to determine whether the timely

processing of requests was an essential function.  Skerski, 257 F.3d at 279.  "A job's 'essential

functions' are defined in 29 C.F.R. §1630.2(n)(1) as those that are 'fundamental,' not

'marginal.'"  Id.  The regulation provides a non-exhaustive list of three factors to assist in

determining whether a job function is essential: 1) "the reason the position exists is to perform

the function"; 2) there are a "limited number of employees available among whom the

performance of that job function can be distributed"; and 3) the function is "highly specialized so

**NOT FOR PUBLICATION**

that the incumbent in the position is hired for his or her expertise."  29 C.F.R. § 1630.2(n)(2).

The regulations also set forth a "non-exhaustive list of seven examples of evidence that are

designed to assist a court in identifying the 'essential functions' of a job."  <u>Skerski</u>, 257 F.3d at

279.  They include:

> 1) The employer's judgment as to which functions are essential;

> 2) Written job descriptions prepared before advertising or interviewing applicants for the job;

> 3) The amount of time spent on the job performing the function;

> 4) The consequences of not requiring the incumbent to perform the function;

> 5) The terms of a collective bargaining agreement;

> 6) The work experience of past incumbents in the jobs; and/or

> 7) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).  "Whether a particular function is essential is a factual determination

that must be made on a case by case basis."  EEOC Interpretive Guidance on Title I of the

Americans with Disabilities Act, 29 C.F.R. pt. 1630, App. 1630.2(n) (2000).  "It follows that

none of the factors nor any of the evidentiary examples alone are necessarily dispositive."

<u>Skerski</u>, 257 F.3d at 279 (citation omitted).

Defendants state that as a case manager at UBHC, plaintiff worked on "processing health

insurance claims for Magellan insurance."  (Shaw Cert. at ¶ 4).  "[C]ase managers such as

plaintiff received requests from either patients or care providers to authorize a certain number of

visits with a psychotherapist."  (<u>Id.</u> at ¶ 5).  "Under Magellan's rules, the case managers were

expected to respond to a request within 5 days of its being received."  (<u>Id.</u> at ¶ 7). "The failure to

**NOT FOR PUBLICATION**

abide by this 5 day turnaround time could have serious implications because it could result in a patient who needed treatment not receiving it or in a patient not being reimbursed for treatment that should have been covered by their insurance." (<u>Id.</u> at ¶ 8).   Shaw also certified that was important for care managers to "interact appropriately with care providers and patients" because "[d]uring these interactions, the care manager in effect became the face of both Magellan and [UBHC]."  (<u>Id.</u> at ¶ 9).

Plaintiff, on the other hand, contends that responding within 5 days was not an essential function.  According to plaintiff, "Magellan, along with other major insurance carriers routinely establish arbitrary time frames within which certain work is expected to be completed.  It is generally understood among healthcare professionals that the various contract time frames for specified care are aspirational."  (Mieliwocki Aff. at ¶ 6).  Plaintiff adds that "[p]rofessional ethics and standards dictate that the healthcare profession provide treatment to any patient who is in need of such treatment."  (<u>Id.</u> at ¶ 10).  "In the instance of a patient seeking treatment for an emergency, especially in the nature of psychiatric care, no insurance form, treatment summary or any other documentation would prohibit the administration and receipt of necessary care."  (<u>Id.</u> at ¶ 11).

The Court finds that responding to requests within five days was an essential function of plaintiff's job.  It is undisputed that Magellan required case managers to process insurance claims within 5 days.  (Shaw Cert. at ¶ 8; Plaintiff's Response to Defs' SUMF ("Pl's SUMF") at  ¶ 51).  Defendants have asserted that such deadline was important both for the welfare of the patients, and for the reputation of Magellan and UBHC.  (Shaw Cert. at ¶¶ 8-9).  Failure to adhere to the

NOT FOR PUBLICATION

deadline could have major consequences for both the patients and for Magellan and UBHC. Although plaintiff has offered several reasons why he did not need to follow the deadline, plaintiff has provided no evidence to dispute the fact that there was a deadline, and has offered no evidence to show that other employees did not adhere to the deadline. Accordingly, plaintiff has failed to create a genuine issue as to whether responding to requests within five days was an essential function of his job.

The question now becomes whether plaintiff was able to respond to requests for coverage within five days without accommodation. As described in the facts and procedural background of this case, defendants have provided evidence of multiple instances when plaintiff failed to respond to request for coverage within five days, or otherwise within a timely manner.[23] This evidence without more, however, is not sufficient to show that plaintiff was unable to perform the essential function of responding in a timely manner. Defendants' evidence does not indicate that plaintiff *never* responded to requests within five days. Were that the case, it would be easy to say that plaintiff was unable to perform the essential functions of his job without a reasonable accommodation. Rather, defendants' evidence suggests that plaintiff was *frequently* behind in his work. The obvious implication is that there must have been some instances in which plaintiff was able to comply with the five day time limit. Keeping in mind that the question here is whether plaintiff was able to perform the essential functions of his job, defendants are essentially asking this Court to make a factual judgment on this issue. Such factual judgments, however, are

---

[23]As that evidence has been provided in the facts and procedural background section of this opinion, the Court will refrain from repeating the factual allegations against plaintiff.

NOT FOR PUBLICATION

inappropriate at the summary judgment stage.  See Anderson, 477 U.S. at 249 (at the summary

judgment stage the court's function is not to weigh the evidence and determine the truth of the

matter).  Moreover, this Court is required to construe the facts and inferences in the light most

favorable to plaintiff.  Curley, 298 F.3d at 277.  Accordingly, defendants have failed to carry

their burden of showing that plaintiff was unable to perform the essential functions of his job

without accommodation. There exists a genuine issue of material fact as to whether plaintiff was

a "qualified individual" under the ADA.

> 2.    *Has plaintiff suffered an "adverse employment decision" as a result of
> discrimination based on his disability?*

Plaintiff alleges that defendants made two adverse employment decisions against him that

resulted from discrimination based on his disability: 1) they failed to reasonably accommodate

his disability, and 2) they terminated him from his employment at UBHC.  An adverse

employment decision in this context includes not only termination from employment, but also

"include[s] refusing to make reasonable accommodations for a plaintiff's disabilities."  Williams

v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004); see also Dicino, 2003 WL

21501818, at *6 ("discrimination under the ADA 'encompasses not only adverse employment

decisions motivated by prejudice and fear of disabilities, but also includes failing to make

reasonable accommodations for a plaintiff's disabilities'") (quoting Taylor v. Phoenixville Sch.

Dist., 184 F.3d 296, 306 (3d Cir. 1999).  "The ADA specifically provides that an employer

'discriminates' against a qualified individual with a disability when the employer does 'not make

reasonable accommodations to the known physical or mental limitations of the individual unless

the [employer] can demonstrate that the accommodation would impose an undue hardship on the

**NOT FOR PUBLICATION**

operation of the business of the [employer].'" <u>Williams</u>, 380 F.3d at 761 (citing <u>Taylor</u>, 184 F.3d at 306 (quoting 42 U.S.C. § 12112(b)(5)(A)) (alterations in original)).  The Court must now determine whether plaintiff has made a *prima facie* showing that defendants' failure to reasonably accommodate his disability, and/or the termination of his employment, were the result[s] of discrimination based on his disability.

Plaintiff claims that defendants failed to make reasonable accommodations for him by refusing to: 1) grant his request for a private office in Edison that plaintiff could utilize during the course of a sleep attack; 2) refusing to provide plaintiff an office where he could control the internal temperature and airflow; and 3) refusing his request to remain in Newark or alternatively, to be allotted flex time in order to travel out of rush hour.  He adds that this failure to accommodate his disability and his termination only occurred after he disclosed his disability to defendant Shaw.  Before disclosing his disability, he claims that he worked for the UMDNJ for nine years, during which time he consistently received satisfactory work evaluations, and received accommodations for his work schedule.  As evidence in support, plaintiff has submitted evaluations that he received from UMDNJ in the 9 years before he revealed his narcolepsy (Watson Aff. at Exh. A), and has also submitted his own affidavit in which he claims that before Shaw arrived at UMDNJ, he received reasonable accommodations for his work schedule. (Mieliwocki Aff. at ¶ 44).

Plaintiff's evidence is insufficient to create a *prima facie* case. While the Court notes that several evaluations of plaintiff do contain positive comments about his performance, there are also several negative comments.  As example, the May 1994 to May 1995 evaluation reports that

-29-

NOT FOR PUBLICATION

plaintiff "continue[d] to struggle with timeliness of documentation due to competing priorities."
(Watson Aff. at Exh. A, ID# 000212).  The November 1998 to November 1999 evaluation
reports "[c]ontinued delays in returning provider/pt. calls. Continued problems with timely
utilization decisions."   (Watson Aff. at Exh. A, ID# 000285).  The same evaluation states that
"[p]atients report frustration with lack of timely response and patient perceived abruptness in
communication."  (Watson Aff. at Exh. A, ID# 000286).  Yet Shaw arrived at UMDNJ in June of
2000, and plaintiff allegedly informed her of his narcolepsy sometime after her arrival. Because
plaintiff's evidence shows that he received negative comments *before* Shaw's arrival, plaintiff's
evidence fails to create a circumstantial inference that his disclosure of his disability caused a
precipitous decline in how he was treated at UMDNJ.  There is simply no basis for concluding
that discrimination based on his disability led to his termination.

          With regard to the accommodation argument, plaintiff only asserts that he was
accommodated in his work schedule before Shaw's arrival in June of 2000, by being permitted to
work 37.5 hours a week, but after disclosing his disability, was forced to work 40 hours per
week.  There is no direct or circumstantial evidence, however, to show that the alleged failure to
accommodate his work schedule after Shaw's arrival was in any way based on discrimination.
Moreover, plaintiff has not asserted that he made the other accommodation requests - an office
with temperature control, a private office for taking naps, and a shorter commute - before he
disclosed his disability.  Plaintiff's evidence does not show that any alleged failure to
accommodate by the defendants' was a result of discrimination.

NOT FOR PUBLICATION

While this Court finds that plaintiff has failed to establish a *prima facie* case of discrimination, for purposes of completeness, this Court will proceed with the <u>McDonnell Douglas</u> burden shifting analysis to assess plaintiff's claim.

> B.    <u>Can defendants articulate some legitimate, non-discriminatory reason for the adverse employment decisions?</u>

Assuming that plaintiff has made a *prima facie* case, the burden now shifts to defendants to articulate some legitimate, non-discriminatory reason for the adverse employment decisions against plaintiff.  <u>Shaner v. Synthes</u>, 204 F.3d 494, 500 (3d Cir. 2000).  "The employer's burden at this stage is 'relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action].'"  <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 500-01 (3d Cir. 1997) (alteration in original) (quoting <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920 n. 2 (3d Cir. 1997).

Plaintiff claims he was denied reasonable accommodations when defendants refused his request to 1) be placed in an office with temperature control; 2) be given a private office where he could nap during a "sleep attack"; and 3) be permitted to remain in Newark, or alternatively, be allotted flex time in order to avoid having to commute during rush hours.  Defendants respond that they did, in fact, attempt to accommodate plaintiff's disabilities, to the extent they could.  Defendant Shaw told plaintiff that "it was impossible to control the airflow in the offices in Edison because the windows were sealed and because there was no mechanism to control the temperature in the individual rooms."  (Shaw Cert. at ¶ 101).  Shaw added that "only supervisors could have private offices." (Shaw Cert. at ¶ 101).  However, defendants did provide plaintiff

**NOT FOR PUBLICATION**

with a fan to help circulation in his office. (Shaw Cert. at ¶ 104; Pl's SUMF at ¶ 136). Shaw also attempted to accommodate plaintiff's need for privacy by putting him in an office with Gries and Sannes, who spent the majority of their time in the hospital, and were frequently absent from their office. (Shaw Cert. at ¶ 102). Shaw told plaintiff that if either Gries or Sannes was in the office when he had a sleep attack, that "he could use the conference room, which was generally empty in the afternoon, to get some privacy." (Shaw Cert. at ¶ 103). About the request that plaintiff be permitted to stay in Newark, or in the alternative, be allotted flex time to travel out of rush hour, Shaw claims that she sent a letter to plaintiff rejecting his request to stay in Newark, on the grounds that "the move to Edison [was] required to improve the utilization process and work more closely with the Transfer Center and Access Center Staff." (Shaw Cert. at ¶ 139; Preuss Cert. at Exh. N). She adds, however, that "in order to accommodate Dr. Nahmias's request that [plaintiff] be given work times that would not involve driving in rush hour, [she] offered to let him work from 12 to 8 on Monday through Thursday and from 10-6 on Friday." (Shaw Cert. at ¶ 140; Preuss Cert. at Exh. N). Plaintiff was instructed to respond to the offer by September 29, 2000. (Pl's Response to Defs' SUMF at ¶ 141). When plaintiff failed to respond to Shaw's offer, he was instructed to work from 9 to 5. (Pl's Response to Defs' SUMF at 142). Shaw claims that she did not permit plaintiff to work the proposed "variable work schedule" proposed by plaintiff's doctor, noting that it "did not meet the needs of the department." (Shaw Cert. at ¶ 112). She added that such a work schedule would have made plaintiff's work harder to keep track of for his supervisor, which in light of plaintiff's difficulties in Newark, she

NOT FOR PUBLICATION

considered to be a priority.  (Shaw Cert. at ¶ 112).  Defendants have articulated legitimate

reasons for its failure to provide plaintiff with the accommodations he requested.

    With respect to plaintiff's termination, defendants have asserted that plaintiff was not

fired because of his disability, but because of the frequent patient complaints about his work; his

persistent failure to process requests in a timely manner; his frequently inappropriate conduct

towards his colleagues, patients, and care givers; and his poor performance on his evaluations.[24]

(Defs' Motion for Summary Judgment at pp. 16-20).  The Court finds that defendants have

articulated a legitimate reason for terminating plaintiff.

    C.    <u>Can plaintiff show that the defendant's proffered reason for terminating plaintiff
was pretextual?</u>

    Now that defendants have proffered legitimate, non-discriminatory reasons for the

adverse employment decisions, plaintiff must "prove by a preponderance of the evidence that the

legitimate reasons offered by the defendant were not its true reasons, but were a pretext for

discrimination."  <u>Shaner</u>, 204 F.3d at 500 (3d Cir. 2000).  The role of the Court is to determine

"whether there is sufficient evidence from which a jury could conclude that the purported reasons

for defendant's adverse employment actions were in actuality a pretext for intentional [disability]

discrimination."  <u>Shaner</u>, 204 F.3d at 501.  "At trial, the plaintiff must convince the finder of fact

'*both* that the reason was false, and that discrimination was the real reason.'"  <u>Shaner</u>, 204 F.3d at

501 (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993) (emphasis in original)).

"The factfinder's rejection of the employer's proffered reason allows, but does not compel,

_____

    [24]The specific evidence in support of this claim is too numerous to list here, but is listed
extensively in the facts and procedural background section of this opinion.

**NOT FOR PUBLICATION**

judgment for the plaintiff."  Shaner, 204 F.3d at 501 (quoting Sheridan v. E.I. DuPont de

Nemours and Co., 100 F.3d 1061, 1066-67 (3d Cir. 1996) (en banc)).

      The Third Circuit has stated that with regard to application of the third prong of the

*McDonnell Douglas* framework at the summary judgment stage:

> [A] plaintiff may defeat a motion for summary judgment (or judgment as a matter
> of law) by pointing "to some evidence, direct or circumstantial, from which a
> factfinder would reasonably either: (1) disbelieve the employer's articulated
> legitimate reasons; or (2) believe that an invidious discriminatory reason was
> more likely than not a motivating or determinative cause of the employer's
> action."

Shaner, 204 F.3d at 501 (quoting Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1999); Sheridan v. E.I.

DuPont de Nemours and Co., 100 F.3d 1061, 1066-67 (3d Cir. 1996) (en banc)).  The Circuit

added that:

> "To discredit the employer's proffered reason, [ ] the plaintiff cannot simply show
> that the employer's decision was wrong or mistaken···· Rather, the non-moving
> plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies,
> incoherencies, or contradictions in the employer's proffered legitimate reasons for
> its action that a reasonable factfinder could rationally find them unworthy of
> credence, and hence infer that the employer did not act for the asserted non-
> discriminatory reasons."

Shaner, 204 F.3d at 501 (quoting Fuentes, 32 F.3d at 765 (citation and internal quotation marks

omitted)).

      Plaintiff has utterly failed to present any evidence, direct or circumstantial, to suggest that

the legitimate reasons offered by defendants for their adverse employment decisions were

pretextual.  As to his claim that he was not accommodated because of discrimination, plaintiff's

only evidence is that he was allowed to work a 37.5 hour work week before disclosing his

disability, but was required to work 40 hours after it was disclosed.  (Pl's SUMF at ¶ 144).  Shaw

**NOT FOR PUBLICATION**

asserts that Dr. Nahmias's proposed variable works schedule "did not meet the needs of the department" (Shaw Cert. at ¶ 112), but she attempted to comply with Dr. Nahmias's request to have plaintiff avoid the rush hour commute by permitting him to start later in the day - 12-8 Monday through Thursday, and 10-6 on Friday.  (Shaw Cert. at ¶ 108).  Moreover, plaintiff continued to come in late, but was never disciplined for coming to work late.  (Pl's SUMF at ¶¶ 146-47).  Plaintiff's evidence is insufficient to cause a reasonable factfinder to believe defendants' proffered legitimate reasons were a pretext for discrimination.

With respect to plaintiff's termination, plaintiff again utterly fails to provide any evidence, direct or circumstantial, to indicate that defendants' proffered reasons for his termination were a pretext for discrimination.  Plaintiff's only evidence in support of this point is a series of reviews he received before Shaw's arrival, in which he received positive comments. However, as discussed in the *prima facie* analysis, section I.A.2, <u>supra</u>, those reviews also contain several negative comments, thereby removing any circumstantial inference that would lead a reasonable factfinder to determine that the disclosure of his narcolepsy led to his termination.  Moreover, defendants have cited extensive evidence to show that plaintiff's performance was lacking both before and after Shaw arrived, thereby adding wieght to their claim that his dismissal was based on poor performance.  Although plaintiff disputes some of defendants' evidence, plaintiff claims to lack sufficient knowledge to answer the majority of the statements, and plaintiff *admits* that he received several complaints.  (Pl's SUMF at ¶¶ 33-35, 56, 67, 68, 85-87, 90, 103, 104, 125).  In the face of this evidence, plaintiff's circumstantial evidence

-35-

**NOT FOR PUBLICATION**

is insufficient to show that defendants' proffered legitimate reasons were a pretext for discrimination.

Upon review of plaintiff's evidence, the Court finds that plaintiff has failed to produce sufficient evidence to permit a reasonable factfinder to conclude that defendants acted with discriminatory intent in their adverse employment decisions against plaintiff.  More specifically, plaintiff has not presented evidence to permit a factfinder either to disbelieve the company's articulated reasons, or to conclude that discrimination on account of disability was the real reason for any of the alleged improper actions.  Defendants' motion for summary judgment on count one is granted.

**II.      Count Two - Claims Predicated on Retaliation under the ADA**

Plaintiff filed two civil rights complaints against defendants in December of 2000, and March of 2001, respectively.  Plaintiff claims that as a result of the civil rights complaints he filed, defendants engaged in numerous acts of retaliation against him in violation Section 503 of the ADA, 42 U.S.C. §12203.

The ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ⋯ under [the ADA]."  42 U.S.C. § 12203(a).  "Thus, it is unlawful for an employer to retaliate against an employee based upon the employee's opposition to anything that is unlawful under the ADA."  Williams, 380 F.3d at 758 (quoting Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003)).

NOT FOR PUBLICATION

"[I]n order to establish a *prima facie* case of illegal retaliation under the anti-discrimination statutes, a plaintiff must show: '(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir. 2002) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir.1997)).  The burden shifting framework of McDonnell Douglas applies to the ADA retaliation claim as well.  Williams, 380 F.3d at 759.

Defendants contend that plaintiff cannot show a causal connection between his filing of the two civil rights complaints against defendants, and any adverse acts taken against him.[25] Plaintiff, on the other hand, argues that such a causal connection can be inferred from the facts that defendants had knowledge of plaintiff's two complaints; defendant Shaw possessed knowledge of the complaint and at times attempted to address them; and defendant Shaw signed the final performance evaluation which served as the basis for the termination.

Plaintiff contends that these facts are somewhat analogous to the case of Shellenberger v. Summit Bank Corp., 318 F.3d 183 (3d Cir. 2003), where the Circuit ruled that the District Court had improperly found that plaintiff lacked sufficient evidence to make a *prima facie* case of retaliation under the ADA.  Shellenberger, however, is easily distinguished.  There, plaintiff filed her first EEOC complaint on July 13, 1998 (two months before she was terminated), and the defendant received notice of that filing on August 17, 1998.  Shellenberger, 318 F.3d at 188-89.

_____

[25]The only adverse act specified in the second count of plaintiff's complaint is plaintiff's termination from his employment.

**NOT FOR PUBLICATION**

There was evidence that plaintiff's supervisor had personal knowledge of the complaint, as

evidenced from the supervisor's statement: "I know that you're taking the legal route, so you

probably just want to consider-just continue in that vein."  Id. at 189.  The Circuit also found that

the supervisor's presence in the office when plaintiff was terminated provided circumstantial

evidence that the supervisor was involved in the decision to terminate the plaintiff.  Id.  Of

central importance, the Circuit noted that the termination occurred just 10 days after the

supervisor's alleged comment.  Id.   The Third Circuit has previously held that "such temporal

proximity between the protected activity and the termination is [itself] sufficient to establish a

causal link."  Id. (citing Woodson, 109 F.3d at 920) (alteration in original).  The Circuit

concluded that the alleged timing of the supervisor's comment (10 days before the firing),

combined with the allegation that the supervisor's comment was made, could lead a reasonable

jury to conclude that plaintiff was fired because she "took the legal route," and was sufficient to

establish a *prima facie* case.  Id.

Here, plaintiff has presented no evidence to show that defendants made any comments to

him concerning his civil rights complaints.  In addition, defendant Shaw was not physically

present at plaintiff's termination, unlike the plaintiff's supervisor in Shellenberger.  Moreover,

there is not the temporal proximity here, as in Shellenberger, between the protected activity and

the plaintiff's termination. Plaintiff in this case filed his civil rights complaints in December of

2000 and in March of 2001, but was not terminated until November of 2001.  In Shellenberger,

by contrast, plaintiff was terminated just two months after his complaint was made, and only one

NOT FOR PUBLICATION

month after the defendant became aware of the complaint.  Shellenberger, 318 F.3d at 188-89.

Plaintiff lacks sufficient evidence to make a *prima facie* claim for retaliation under the ADA.

Even if this Court were to find that plaintiff could make a *prima facie* case, his claim

would still fail.  Under the McDonnell Douglas, burden shifting framework, defendants have

articulated a legitimate motive for plaintiff's termination: his generally poor performance.  When

the burden shifts back to plaintiff, there is no evidence cited by plaintiff to show that this

legitimate motive for his termination was merely a pretext for defendants' retaliatory animus.

Defendants' motion for summary judgment on count two is granted.

**III.     Count Three - Interference with Plaintiff's Substantive Rights Under FMLA**

The third count of plaintiff's complaint alleges that defendants interfered with his rights

under FMLA, in violation of 29 U.S.C. §2615(a)(1).  Under 29 U.S.C. §2612(a)(1)(D), an

eligible employee is entitled to twelve weeks of leave during any twelve month period due to a

serious health condition which renders the employee unable to perform the functions of his or her

position.

To state a *prima facie* substantive violation under the FMLA, "the employee only needs

to show that he was entitled to benefits under FMLA and that he was denied them."  Callison v.

City of Philadelphia, 128 Fed.Appx. 897, 899 (3d Cir. 2005).  The relevant agency regulations

add that "[i]nterfering with' the exercise of an employee's rights would include, for example, not

only refusing to authorize FMLA leave, but discouraging an employee from using such leave."

22 U.S.C. §825.220(b).  Plaintiff claims that he gave notice of his intention to take FMLA leave,

but that his rigid Edison work schedule did not amount to leave.

NOT FOR PUBLICATION

Defendants contend that plaintiff is unable to show that he was denied his rights under FMLA.  Defendants assert that plaintiff applied for intermittent leave in order to avoid the strict application of the University's time and attendance policy.  They cite plaintiff's testimony to show that during the time the application for FMLA leave was pending, the University did not enforce its time and attendance policy against plaintiff.  (Pl's Deposition at pp. 312-13).  The application for FMLA was granted in July of 2001.  (Shaw Cert. at ¶ 118).

Although plaintiff contends that he was denied his rights under FMLA based on his Edison work schedule, plaintiff has not advanced any evidence to show that he was ever punished for coming to work late. See Alifano v. Merck & Co., Inc., 175 F.Supp.2d 792, 794 (E.D.Pa. 2001) ("Courts have refused to recognize a valid claim for interference in the absence of any injury.") (citations omitted). This Court finds no evidence to support plaintiff's claim that defendants interfered with his rights under FMLA.  Defendants' motion for summary judgment on count three is granted.

**IV.     Counts Four and Five** - **Retaliation under FMLA**

Counts four and five assert claims of retaliation under the FMLA, in violation of 29 U.S.C. §§2615(a)(1) and (2).  Count four specifically asserts a claim for discrimination under the FMLA, based on 29 U.S.C. §2615(a)(2), while count five asserts a claim for retaliation under the FMLA, based on U.S.C. §§2615(a)(1) and (2).  However, "federal regulations interpret section 2615(a)(2) as providing a cause of action for employees who have been discriminated against in retaliation for taking FMLA leave." Alifano, 175 F.Supp.2d at 794 (E.D.Pa. 2001) (citing 29

-40-

**NOT FOR PUBLICATION**

C.F.R. § 825.220(c)).  Moreover, in <u>Sommer v. Vanguard Group</u>, 380 F.Supp.2d 680, 683

(E.D.Pa. 2005), the court described two types of claims that may be asserted under the FMLA:

> (1) interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the FMLA, <u>see</u> 29 U.S.C. § 2615(a)(1); and (2) retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the FMLA, <u>see</u> 29 U.S.C. § 2615(a)(1) & (2).

The Court questions whether counts four and five can properly be asserted as separate claims, as

they are both essentially claims for retaliation under the FMLA.  Consequently, this Court will

assess counts four and five of plaintiff's complaint as claims for retaliation.

    In the Third Circuit, retaliation claims under FMLA are analyzed according to the

<u>McDonnell Douglas</u> burden-shifting framework.  <u>Lepore v. Lanvision Systems, Inc.</u>, 113

Fed.Appx. 449, 453 (3d Cir. 2004).   "To establish a *prima facie* showing of retaliation under the

FMLA, a plaintiff must show that (1) [he] took an FMLA leave, (2) [he] suffered an adverse

employment decision, and (3) the adverse decision was causally related to [his] leave."  <u>Id.</u>

(citing <u>Conoshenti v. Public Svce. Electric & Gas Co.</u>, 364 F.3d 135 (3d Cir. 2004)).

    There is no dispute that plaintiff took an FMLA leave, and that he was terminated.

Defendants argue, however, that plaintiff has no evidence to support a causal connection between

his request for FMLA leave and his termination.  As evidence to support such causal connection,

plaintiff argues that before defendant Shaw's arrival at work, he did not have any problems in

connection with his work.  Plaintiff contends that after defendant Shaw arrived, however, Shaw

apparently viewed plaintiff as a troublemaker because he tried to manage his disability by

seeking protections of the law based on the failure to accommodate. As such, plaintiff says this

**NOT FOR PUBLICATION**

constitutes a causal connection between his request for leave under the FMLA and his

termination.  Unfortunately for plaintiff, however, there is absolutely no evidence to support this

assertion.  Plaintiff has failed to make a *prima facie* case for retaliation under the FMLA.[26]

 Even if this Court were to accept that plaintiff had made a *prima facie* showing,

plaintiff's claim would still fail.  As mentioned previously, defendants have asserted that the true

reason for plaintiff's termination was his poor performance.  Shifting the burden back to plaintiff,

there is absolutely no evidence to show that this proffered reason is a pretext for defendants'

retaliatory animus.  Defendants' motion for summary judgment on counts four and five is

granted.

---

 [26]Although plaintiff has offered a laundry list of acts which he claims are retaliatory in
nature, none of the acts alleged in paragraphs 27 and 28 of plaintiff's complaint constitute
adverse employment decisions.  The alleged retaliatory acts include, among others, plaintiff
being told that he walks around too much, and the failure to celebrate plaintiff's birthday.
However, "[a]n 'adverse employment action' is one that is " 'serious and tangible enough to alter
an employee's compensation, terms, conditions, or privileges of employment.'" Langley v.
Merck & Co., Inc., 2006 WL 1647015, at *2 (3d Cir. 2006) (citations omitted).  None of the acts
alleged in paragraphs 27 or 28 fit that requirement.

**NOT FOR PUBLICATION**

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment on counts one through five of plaintiff's complaint is granted.  Because summary judgment is granted on all claims, the Court need not address defendants' argument that the claims should be dismissed against the individual defendants.


<u>**s/William H. Walls**</u>
United States Senior District Judge